UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

JOSEPH WORTMAN, )
)
Plaintiff, )
)
v. )                    Case No. 5:16-cv-220
)
NANCY A. BERRYHILL, Acting )
Commissioner of Social Security,[1] )
)
Defendant. )

## OPINION AND ORDER
### (Docs. 15, 18)

Plaintiff Joseph Wortman brings this action under 42 U.S.C. § 405(g), requesting reversal

of the decision of the Commissioner of Social Security denying his applications for supplemental

security income ("SSI") and disability insurance benefits ("DIB"). Pending before the court is

Mr. Wortman's motion to reverse the Commissioner's decision (Doc. 15) and the

Commissioner's motion to affirm (Doc. 18). For the reasons stated below, the court DENIES

Mr. Wortman's motion to reverse and GRANTS the Commissioner's motion to affirm.

### Background

Mr. Wortman, born in 1985, applied for SSI benefits on May 28, 2013, and for DIB

benefits on June 7, 2013, alleging a disability onset date of June 20, 2012. (AR 11, 188, 190.)

The claims were denied initially on August 8, 2013, and on reconsideration on October 11, 2013.

(AR 11, 120, 128.) Mr. Wortman had a hearing before Administrative Law Judge ("ALJ") Paul

Martin on December 2, 2014. (AR 31.)

---

[1] The court has amended the caption to reflect the current Acting Commissioner of Social
Security, who assumed office on January 20, 2017. *See* Fed. R. Civ. P. 25(d).

At the hearing, Mr. Wortman testified that he had a high school diploma, but that he had learning disabilities and was placed in special education programs throughout his schooling. (AR 38.) He also had taken a few community college classes, where he received other accommodations based on his learning disabilities. (AR 38–39.)

According to Mr. Wortman, his learning comprehension challenges are his biggest issue. (AR 46.) He testified that as a child he was diagnosed with Sotos Syndrome.[2] (AR 57.) He has trouble comprehending what he reads, and he cannot read more than a few pages without becoming bored and losing focus. (AR 46–47.) He said that, in his previous position as an inventory manager, he could keep track of information between one quarter and one half of the time. (AR 47.)

Mr. Wortman also testified that he "get[s] an electrical charge through [] my neck and into my brain and it messes me up a little." (AR 40.) He said that one of his doctors wishes to start him on a new medication for this issue. (AR 53.) He also complained that he has had trouble with his equilibrium. (AR 53.)

Mr. Wortman testified that he suffers from depression and anxiety. He said that he typically simply stays at home and does not like to go anywhere. (AR 54.) He related an incident in the past week, in which, simply sitting in his apartment, he "felt like I couldn't breathe." (AR 55.) He said he has a friend who lives down the hall that he sees occasionally, but that he does not go out in public. (AR 54.) Large groups of people cause Mr. Wortman to

---

[2] "Sotos syndrome is a disorder characterized by a distinctive facial appearance, overgrowth in childhood, and learning disabilities or delayed development of mental and movement abilities." *Sotos Syndrome*, U.S. Nat'l Lib. of Med., Genetics Home Reference, https://ghr.nlm.nih.gov/condition/sotos-syndrome (last visited Aug. 1, 2017.) "People with Sotos syndrome often have intellectual disability, and most also have behavioral problems." *Id.*

become anxious, and he avoids going shopping at the supermarket during the day for this reason. (AR 72.) He says that he can get along with a small group of people. (AR 75.)

Mr. Wortman also testified to physical impairments. He testified that he gets back spasms after standing for just a couple of minutes. (AR 58.) He also has nerve pain in one of his feet and that a doctor has prescribed an orthopedic shoe as a corrective, although he has not yet had an appointment to obtain the shoe. (AR 49–51.)

With regard to current treatment, Mr. Wortman said that he currently sees his therapist every few weeks, takes Effexor for his depression and anxiety, and takes Mobic for back pain. (AR 55–56, 67.)

Mr. Wortman testified that he is recently divorced, and that, while he lives by himself, his girlfriend provides daily assistance to him. (AR 39–40.) She typically does the driving, although Mr. Wortman drives occasionally. (AR 40.) Mr. Wortman's girlfriend also helps him with cooking and other chores. (AR 74.)

Mr. Wortman also testified about his prior work history. (AR 41–45, 65–66.) He has worked as a security guard, a landscaper, a warehouse worker, a stock clerk, and an inventory clerk, among other positions. He was also briefly in the military, but he stated that he did not make it through basic training, and was discharged. (AR 48.)

Vocational expert ("VE"), James Parker, also testified at the hearing. (AR 76–82.) The ALJ questioned the VE about whether Mr. Wortman had worked in his prior jobs long enough to become competent in them, and whether they required interaction with large groups or extensive reading. (AR 78–80.)

## ALJ Decision

The ALJ is required to follow the five-step process in determining a claimant's disability. *Machia v. Astrue*, 670 F. Supp. 2d 326, 333 (D. Vt. 2009) (internal citation omitted);

3

*see* 20 C.F.R. §§ 404.1520, 416.920. The answer at each step determines if the next step must be addressed. *Machia*, 670 F. Supp. 2d at 330. At the first step the ALJ determines if the claimant has engaged in substantial gainful activity since the alleged onset date of his disability. *Id.* If the answer is no, step two then asks if the claimant has any "impairments" that are "severe." *Id.*

If there is one or more severe impairment, step three evaluates whether any of these impairments meet the listed impairments in Appendix 1 of the regulations; if an impairment meets the listing the claimant is deemed disabled. If it does not, step four asks whether the claimant retains the residual functional capacity ("RFC") to do his past relevant work. *Id.* If the claimant can no longer do his past relevant work, step five asks whether the claimant is able to do any job available in significant numbers in the national economy. *Id.* "The claimant bears the burden of proving his case at steps one through four, . . . and at step five, there is a 'limited burden shift to the Commissioner' to 'show that there is work in the national economy that the claimant can do.'" *Larkin v. Comm'r of Soc. Sec.*, No. 2:10-CV-291, 2011 WL 4499296, at *2 (D. Vt. Sept. 27, 2011) (quoting *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009)).

At step one, the ALJ determined that Mr. Wortman had not engaged in any substantial gainful activity since his alleged onset date, June 20, 2012. (AR 13.) At step two, he found that Mr. Wortman had the following severe impairments: Sotos syndrome with an anxiety disorder; a depressive disorder; a cognitive disorder; a learning disorder; and attention deficit disorder. (AR 13.) The ALJ concluded that none of Mr. Wortman's alleged physical impairments were severe. (AR 14.) At step three, the ALJ found that none of Mr. Wortman's impairments met or medically equaled a listed impairment. (AR 15.)

Ahead of step four, the ALJ determined that Mr. Wortman had an RFC to perform a full range of work at all exertional levels, but with some non-exertional limitations. (AR 17.)

4

Mr. Wortman was "limited to interacting with groups of no larger than 8 to 10 people and capable of engaging in only brief, superficial interaction with the general public." (*Id.*) He was also able "to read short, simple written instructions and otherwise be able to understand, remember, and carry out tasks involving four to five step instructions." (*Id.*) The ALJ noted that he was "able to maintain concentration, persistence, and pace for two-hour intervals throughout the course of an 8-hour workday and 40-hour workweek," and was able to "adapt to routine workplace changes." (*Id.*)

At step four, the ALJ found that, with this RFC, Mr. Wortman could perform some of his past relevant work, including his positions as a security guard, warehouse worker, stock clerk, and landscape laborer. (AR 21.) The ALJ therefore concluded that Mr. Wortman was not disabled and did not reach step five. (AR 22.)

The Appeals Council denied review on June 29, 2016. (AR 1.) This case was filed on August 8, 2016. (Doc. 1.)

### Standard of Review

Disability is defined by the Social Security Act in pertinent part as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Under the Act, a claimant will only be found disabled if it is determined that his "impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

When considering the ALJ's disability decision, the court "review[s] the administrative record de novo to determine whether there is substantial evidence supporting the . . . decision

5

and whether the Commissioner applied the correct legal standard." *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g). The decision is subject to a factual review determining whether "substantial evidence" exists in the record to support such decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *see Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the fact[-]finder."). "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Poupore*, 566 F.3d at 305. The court is mindful that the Social Security Act is "a remedial statute to be broadly construed and liberally applied." *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981); *see also, e.g., Johnson v. Comm'r of Soc. Sec.*, No. 2:13-cv-217, 2014 WL 2118444, at *3 (D. Vt. May 21, 2014).

## Analysis

Mr. Wortman makes three arguments on appeal. First, he argues that the ALJ did not provide "good reasons" for discounting the opinions of treating sources and for according substantial weight to the opinions of other sources. (Doc. 15-1 at 8–11.) Second, he contends that the ALJ did not rely on a medical opinion to craft Mr. Wortman's RFC and instead improperly used his own lay knowledge. (*Id.* at 6–8.) Third, he asserts that the ALJ erred by failing to ask the vocational expert whether a hypothetical worker with all the limitations described in the RFC could perform his past work. (*Id.* at 12.)

### I.     Opinion Evidence

The weight to be accorded a medical opinion depends on several factors: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the relevant evidence supporting the opinion; (4) the consistency of

the opinion with the record as a whole; (5) whether the opinion is of a specialist; and (6) other factors which tend to support or contradict the opinion. 20 C.F.R. §§ 404.1527(c)(2)–(6), 416.927(c)(2)–(6); *see also Wolfe v. Comm'r of Soc. Sec.*, 272 F. App'x 21, 23 (2d Cir. 2008).[3] The opinions of treating physicians are generally given "a measure of deference" by the ALJ. *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (per curiam); *see also* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Where a treating physician's opinion is not given controlling weight, the ALJ should determine the appropriate weight to be accorded by reference to the same factors discussed above. 20 C.F.R. §§ 404.1527(c), 416.927(c). The Commissioner is required to give "good reasons" for the weight given to a treating source's opinion. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

The following opinions from doctors and other medical providers are in the record: a mental residual functional capacity statement and a letter from December 18, 2013, both written by Mr. Wortman's treating therapist, Nicholas Nicolet; another mental residual functional capacity statement, dated June 19, 2014, by Mr. Nicolet, but also cosigned by Dr. Matthew Frankel, who supervised Mr. Nicolet's treatment of Mr. Wortman; the opinion of psychologist Dr. Kathleen Rickard, who conducted a consultative psychological examination on July 25, 2013; and the opinions of two state agency psychological consultants, Dr. Edward Hurley, and Dr. Howard Goldberg.

### A.    Mr. Nicolet and Dr. Frankel

The first mental residual functional capacity statement by Mr. Nicolet, completed on December 18, 2013 describes significant functional limitations for Mr. Wortman. (AR 525.) He

---

[3] The court applies the regulations in effect at the time Mr. Wortman's application was submitted. The regulations regarding evaluation of medical evidence have recently changed for claims filed on or after March 27, 2017. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844 (Jan. 18, 2017).

noted that Mr. Wortman has a depressive disorder NOS,[4] an anxiety disorder NOS, a cognitive disorder NOS, a "mixed receptive-expressive language disorder," attention deficit disorder, Sotos Syndrome, static "encephalopathy manifest by megalencephaly," and "chronic unstable housing, employment, & social difficulties." (AR 525.) He stated that he believed Mr. Wortman's impairments and symptoms would prevent him from working 40 hours a week. (AR 525.)

Mr. Nicolet assessed substantial limitations for Mr. Wortman, marking in most categories that he would be unable to perform specific mental tasks and social interactions for at least 15% of every workday. (AR 526–27.) He noted that Mr. Wortman would be off task at least 30% of the workday, that he would miss at least five days of work a month, and that he would be 50% as efficient as an average worker. (AR 528.) He specified that Mr. Wortman had a full scale IQ score of 80, according to tests administered in 1997. (*Id.*) He described Mr. Wortman's "reduced intellectual function" as including "impulsivity[,] poor decision making history, often sidetracked & derailed in thought." (*Id.*) He assessed a current GAF score of 45,[5] and justified it, stating that Mr. Wortman had "serious & persistent anxiety & depression, impaired communication, impaired judgment, no work activities, unstable housing, some difficulty in sustaining coherent conversations, which apply all the time, and have worsened." (*Id.*)

---

[4] "NOS" is an acronym for "not otherwise specified," and is used to signify that a medical provider is able to make a general diagnosis, but cannot make a more specific one.

[5] A GAF score "rates the overall psychological functioning of an individual on a scale of 0 to 100, with higher scores reflecting greater functioning." *Sweet v. Berryhill*, No. 2:16-cv-110, 2017 WL 2615439, at *6 n.4 (D. Vt. June 16, 2017). A score between 41 and 50 "indicates serious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job)." *Id.* (internal quotation marks and alterations omitted). "The GAF scale has been removed from the latest version" of the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders. *Id.*

In the accompanying letter, Mr. Nicolet stated that Mr. Wortman's "disabilities prevent him from maintaining employment due to a variety of factors[,] including his difficulties in learning new skills, his difficulty in following directions and to remain self directed, communication difficulties which result in workplace conflict, and struggles with affect regulation." (AR 521.) Mr. Nicolet noted that, though Mr. Wortman had "brief periods of work," there is "a pervasive pattern of losing his job," and he is "ill[-]equipped to manage the additional psychosocial stressors that come with this." (AR 521.) Mr. Wortman's disabilities prevent him from "engaging in a meaningful way with employment training." (AR 521.)

The second mental residual functional capacity statement, completed on June 19, 2014, and cosigned by Dr. Frankel, essentially repeated the conclusions of the first. (AR 649–652.) Mr. Nicolet did mark that, in all categories, Mr. Wortman would be unable to perform work tasks and social interactions for at least 15% of every workday. (AR 650–51.) He also assessed a current GAF score of 40. (AR 652.)

The ALJ accorded "limited weight" to the opinions of Mr. Nicolet and Dr. Frankel. (AR 21.) Mr. Nicolet's assessment was "inconsistent with medically documented findings noted throughout [Mr. Wortman's] treatment records" in general and the lack of "evidence of medically document findings" in Mr. Nicolet's treatment notes. (*Id.*) He noted that Dr. Frankel characterized Mr. Wortman as having only a "moderate level of disability" in a treatment note, and that medical records "repeatedly note [Mr. Wortman's] ongoing efforts to obtain employment with no . . . assessment [by any treating provider] that he would be unable to sustain any work activity on a regular and continuing basis." (*Id.*)

Mr. Wortman first argues that the ALJ failed to provide "good reasons" for discounting the opinions of Mr. Nicolet and Dr. Frankel. (Doc. 15-1 at 9–11.) He contends that the ALJ did

not appropriately consider that both Mr. Nicolet and Dr. Frankel had a treatment relationship with Mr. Wortman; nor did he appropriately consider Dr. Frankel's expertise as a psychiatrist. (Doc. 15-1 at 10.)

The court begins with the ALJ's treatment of Mr. Nicolet. Only a medical provider who is classified as an "acceptable medical source" may be considered a treating physician. *See* 20 C.F.R. § 404.1527(a)(2), 416.927(a)(2) (defining "[t]reating source" as an "acceptable medical source . . . who has, or has had, an ongoing treatment relationship with you"). Mr. Nicolet, who identifies himself as a "Mental Health Counselor" with a master's degree, is not an "acceptable medical source" under the regulations.[6] *See* 20 C.F.R. §§ 404.1502(a), 416.902(a); *Perillo v. Astrue*, 516 F. Supp. 2d 206, 208 (D. Conn. 2007). Accordingly, the ALJ could not accord "controlling weight" under the treating physician rule to Mr. Nicolet's opinions, nor were the same "good reasons" required in analyzing a treating physician's opinion required to support the ALJ's determination to discount Mr. Nicolet's opinion. *Taylor v. Astrue*, 899 F. Supp. 2d 83, 88–89 (D. Mass. 2012); *Atkinson v. Comm'r of Soc. Sec.*, No. 5:16-CV-0809, 2017 WL 1288723, at *6 (N.D.N.Y. Apr. 6, 2017). The ALJ did, as he was permitted to do so, however, consider Mr. Nicolet's opinion under factors similar to those listed in 20 C.F.R. §§ 404.1527(c)(2)–(6), 416.927(c)(2)–(6), discussed above. SSR 06-03p; *Reynard v. Colvin*, 220 F. Supp. 3d 529, 537–38 (D. Vt. 2016) (citing SSR 06-03p).[7]

Even so, the ALJ recognized and acknowledged the treating relationship between Mr. Nicolet and Mr. Wortman, noting twice that the records document an "ongoing course of

---

[6] On the other hand, therapists who identify themselves as "M.A., psychologist," may be considered acceptable medical sources. *Martell v. Comm'r of Soc. Sec.*, No. 2:12-CV-152, 2013 WL 1429459, at *4 (D. Vt. Mar. 22, 2013).

[7] SSR 06-03p was rescinded for claims filed on or after March 27, 2017. Rescission of Social Security Rulings 96-2p, 96-5p, and 06-3p, 82 Fed. Reg. 15263-01 (Mar. 27, 2017).

10

treatment with a therapist." (AR 18–19.) The records bear this statement out: Mr. Nicolet saw Mr. Wortman frequently, and often on a weekly basis, between September 2012 and October 2014. (AR 409–76, 486–502, 515–18, 541–55, 634–36, 639–46, 694–98, 701–02, 718–31, 743–47.) The ALJ explained that the reason he nonetheless accorded limited weight to the opinions of Mr. Nicolet was because he found the opinion "inconsistent with medically documented findings noted throughout his treatment records" and with the evidence "with regard to the claimant's overall level of activity." (AR 21.) He also explained that the "records repeatedly note his ongoing efforts to obtain employment with no indication of record by any treating provider of any assessment that he would be unable to sustain any work activity on a regular continuing basis." (*Id.*)

These reasons are supported by substantial evidence. Mr. Nicolet frequently supported and encouraged Mr. Wortman to pursue employment. (AR 413, 420, 430, 438, 455, 635, 641, 695, 697.) In January 2013, Mr. Nicolet specifically opined that Mr. Wortman's "relationships have been a source of problems for him during the last 6 years, and that client has demonstrated successful history, ability, and enjoyment and purpose from holding a job." (AR 430.) It does not appear that, outside of the medical opinions at issue, Mr. Nicolet or any other medical source suggested that Mr. Wortman's impairments prevent him from working. While acknowledging Mr. Wortman's cognitive and learning impairments, the ALJ noted that the evidence "depicted an individual with dissatisfaction (relationships, jobs, etc.), but with no indication of limitations that would preclude sustained work activity." (AR 18.) The record substantially supports this conclusion. (AR 430, 474, 476.)

Additionally, the record shows a higher overall level of activity than would be consistent with the drastic limitations suggested by Mr. Nicolet, as the ALJ noted. (AR 20.) Mr. Wortman

11

attended community college classes (although he did poorly and had to retake two classes), reported preparing his own meals, doing the dishes, taking out the trash, and doing the laundry. (AR 293, 547.)

Nor did the ALJ err in not according controlling weight to the second residual functional capacity evaluation because it had been signed by Dr. Frankel. While Mr. Wortman argues now that Dr. Frankel was his treating psychiatrist, it appears from the record that Dr. Frankel saw Mr. Wortman only twice. (AR 630, 690.) That is not sufficient to qualify for the extra weight accorded to the opinion of a treating physician. *See Mongeur v. Heckler*, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983) (holding that the opinions of a treating physician who had only seen the claimant "once or twice" were not entitled to controlling weight).

Moreover, there are no medical findings in either treatment note by Dr. Frankel that supports the severe limitations posited in the RFC evaluation. The doctor noted that Mr. Wortman's behavior was "grossly appropriate"; he had "generally good" eye contact and normal speech; his thought process was "grossly linear and goal directed"; he was alert and oriented; he denied delusions and "overt psychotic symptoms"; and that both his insight and judgment were "felt to be fair." (AR 691; *see also* AR 630.)

Mr. Wortman argues that the ALJ misinterpreted Dr. Frankel's comment in a treatment note that Mr. Wortman has a "moderate level of disability." (Doc. 15-1 at 10.) The court disagrees. In the treatment note in question, Dr. Frankel noted that "Mr. Wortman's extent of disability appears to be moderate." (AR 631.) This single sentence, with no elaboration, contradicts the extreme limitations proposed in the RFC evaluation. It is therefore a reasonable basis on which to discount the weight accorded the evaluation.

12

### B.    Dr. Rickard

Consultative examiner Dr. Rickard examined Mr. Wortman on July 25, 2013.  (AR 503.)
She noted normal gait, posture, grooming, and speech pattern, and that he was cooperative and
maintained appropriate eye contact.  (AR 505.)  She remarked that he appeared pensive and that
"[h]is typical mood is depressed and anxious," that he has high energy levels when happy, and
low levels when depressed, that he reports a low ability to concentrate, high levels of anxiety
when around "a lot of people," and that "he sometimes feels hopeless."  (*Id.*)  She noted that his
"formal qualities of thought appeared to be clear and organized," that he was oriented, did not
have hallucinations, that there was "no evidence of loose associations, tangential thinking,
bizarre ideas, delusions, ideas of reference, or paranoid thinking patterns."  (*Id.*)  She noted that
he "was alert and appeared to be average in intelligence."  He scored 30 out of 30 on the
Mini-Mental Status Exam, a score which the doctor noted "does not typically indicate the
presence of cognitive impairment."  (*Id.*)  Dr. Rickard diagnosed Mr. Wortman with a learning
disorder, NOS; depressive disorder, NOS, and a generalized anxiety disorder.  (AR 506.)

Dr. Rickard summarized her opinions regarding Mr. Wortman's limitations:

> He denied any one-on-one social anxiety, but can start to feel anxious in larger
> groups.  He retained an unimpaired ability to relate to others.  His ability to
> engage in activities appeared affected by his emotional state.  His short and
> long-term memories appeared to be intact and he was able to concentrate and
> attend to tasks.

(*Id.*)

Although Mr. Wortman does not specifically challenge the ALJ's determination to accord
substantial weight to Dr. Rickard's opinion, he argues that the ALJ "was obligated to address
how a consultative examiner [Dr. Rickard] who saw Plaintiff one time has a better understanding
of an individual than a counselor who has treated Plaintiff more than 50 times in the past three
years."  (Doc. 15-1 at 11.)

13

Despite Mr. Wortman's suggestion to the contrary, the ALJ *did* explain why he gave substantial weight to the opinion of Dr. Rickard, as opposed to the opinions of Mr. Nicolet and Dr. Frankel. (AR 21.) The ALJ explained that Dr. Rickard's opinion was given "substantial weight" for the very reasons that the opinions of Mr. Nicolet and Dr. Frankel were given lesser weight. (*Id.*) Dr. Rickard's opinion was "generally consistent with the evidence of record as a whole, including evidence . . . with regard to the claimant's overall level of activity during the period under review." (*Id.*) An ALJ may accord more weight to the opinion of a consultative examiner over a treating physician, provided he provides "good reasons." *Marcano v. Berryhill*, No. 13 CV 3648, 2017 WL 2571353, at \*18 (S.D.N.Y. Mar. 29, 2017).

Mr. Wortman does not point to any specific evidence in the record which contradicts the reasons given by the ALJ, nor does the court discern any. Accordingly, the court finds these reasons constitute substantial evidence to support the substantial weight accorded to the opinion of Dr. Rickard.

## C. State Agency Consultants—Dr. Hurley and Dr. Goldberg

Dr. Hurley's opinion, from August 8, 2013, was written in connection with the Social Security Administration's evaluation of Mr. Wortman's initial application for benefits. (AR 84–90.) He opined that Mr. Wortman had affective disorders and a learning disorder, but concluded that none of them were severe. (AR 88.) He noted that "the total and longitudinal record indicates that [Mr. Wortman] may need to avoid crowds but, otherwise, his impairments do not result in significant functional limitations." (AR 87.) He also marked that Mr. Wortman had mild restrictions in the activities of daily living, mild difficulties in social functioning, and mild difficulties in maintaining concentration, persistence or pace. (AR 88.)

14

Dr. Goldberg, writing on October 4, 2013, concurred with Dr. Goldberg. (AR 105.) He wrote that he had considered evidence submitted since Dr. Hurley's opinion, including a function report submitted by Mr. Wortman. (*Id.*)

The ALJ accorded "substantial weight" to the opinions of Dr. Hurley and Dr. Goldberg. (AR 21.) He found "their assessments to be generally consistent with the evidence of record as a whole, but also noted that, "based upon additional evidence received at the hearing level, [Mr. Wortman] is somewhat further limited than [as] assessed by" the two consultants. (*Id.*)

Mr. Wortman challenges this determination. He argues that the ALJ improperly accorded their opinions substantial weight because the agency consultants determined that Mr. Wortman had no severe impairments and therefore no limitations, while the ALJ determined that Mr. Wortman had five severe impairments and assessed related limitations. (Doc. 15-1 at 7.) Furthermore, he contends, the ALJ erred in relying on the doctors' opinions "given the evidence not viewed by" them. (*Id.*)

The court disagrees. An ALJ's ultimate determination need not fit perfectly with every aspect of a doctor's opinion which has been accorded some amount of weight. *See infra.* Moreover, the ALJ *did discount* the consultants opinions in light of evidence submitted after their opinions had issued. He specifically stated that later submitted evidence had caused him to conclude that Mr. Wortman was "somewhat further limited" than the agency consultants had found. (AR 21.) It was permissible for the ALJ to accord weight to the fact that two agency consultants had determined, not merely that Mr. Wortman's severe impairments did not render him disabled, but in fact that he had no severe impairments, even if this conclusion was not the determination of the ALJ. Mr. Wortman does not point to any evidence that would have required the ALJ to discount their opinions entirely, nor has the court found any.

## II. The RFC Determination

It is the ALJ's responsibility to determine a claimant's residual functional capacity. *See* 20 C.F.R. §§ 404.1546(c), 416.946(c). In doing so, the ALJ must consider "all of the relevant evidence." 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). Thus, while the ALJ may "consider opinions from medical sources on issues such as. . .residual functional capacity. . .the final responsibility for deciding these issues is reserved to" the ALJ. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). "An ALJ may accept parts of a doctor's opinion and reject others." *Camille v. Colvin*, 652 F. App'x 25, 29 n.5 (2d Cir. 2016).

An ALJ's conclusion need not "perfectly correspond with any of the opinions of medical sources cited in his decision," for he is "entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole." *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) (citing *Richardson v. Perales*, 402 U.S. 389, 399 (1971)); *accord Durden v. Colvin*, 191 F. Supp. 3d 429, 455 (M.D. Penn. 2016) ("[A]n ALJ can give partial credit to all medical opinions and can formulate an RFC based on different parts from the different medical opinions."). In fact, "a medical source statement or formal medical opinion is not necessarily required," so long as "'the record contains sufficient evidence from which an ALJ can assess the claimant's residual functional capacity.'" *Monroe v. Comm'r of Soc. Sec.*, 676 F. App'x 5, 8 (2d Cir. 2017) (quoting *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 34 (2d Cir. 2013)) (internal alterations omitted). On the other hand, "the ALJ is not free to form his own medical opinion based on the raw medical evidence." *Goble v. Colvin*, No. 15-CV-6302, 2016 WL 3179901, at *6 (W.D.N.Y. June 8, 2016); *accord Dennis v. Colvin*, 195 F. Supp. 3d 469, 474 (W.D.N.Y. 2016).

Mr. Wortman argues that the ALJ improperly relied on his own lay knowledge to craft the RFC. (Doc. 15-1 at 8.) He points out that none of the doctors accorded substantial weight—

Dr. Rickard, Dr. Hurley, and Dr. Goldberg—offered a function-by-function assessment.

(Doc. 15-1 at 6–7.) Furthermore, he contends, the RFC bears no relation to the opinion of

Dr. Rickard, the most detailed of the opinions relied on by the ALJ, and that that opinion is too

vague to be relied on anyway. (Doc. 15-1 at 7–8.)

The court disagrees. First, as a general matter, the absence of a function-by-function

assessment is not a basis to discount the opinion of a medical source. *Doyle v. Berryhill*,

No. 5:16-cv-24, 2017 WL 2364312, at *6 & n.4 (D. Vt. May 31, 2017) (collecting cases).

Second, as noted above, an ALJ's RFC determination is not invalid merely because it

does not align perfectly with any one medical opinion. Here, while the ALJ's RFC

determination does not mirror Dr. Rickard's opinion or that of any other medical source, it

clearly relies on them. The RFC provides for the following nonexertional limitations:

> [1] [H]e is limited to interacting with groups of no larger than 8 to 10 people and
> capable of engaging in only brief, superficial interaction with the general public.
> [2] He is able to read short, simply written instructions and otherwise would be
> able to understand, remember, and carry out tasks involving four to five step
> instructions. [3] He is able to maintain concentration, persistence, and pace for
> two-hour intervals throughout the course of an 8-hour workday and 40-hour
> workweek; and could adapt to routine workplace changes.

(AR 17.)

The first limitation reflects Dr. Rickard's conclusions that Mr. Wortman "can start to feel

anxious in larger groups" but does not have any "one-on-one social anxiety," and that "his ability

to engage in activities appeared affected by his emotional state." (AR 506.) It also reflects

Dr. Hurley's comment that "he may need to avoid crowds" because they can make him anxious.

(AR 87.) The second limitation is more restrictive than provided for in Dr. Hurley's opinion,

which noted no limitations in Mr. Wortman's ability to understand and carry out instructions

(AR 506), but less restrictive than the opinion of Mr. Nicolet and Dr. Frankel, who stated that

Mr. Wortman would have difficulty understanding and following short, simple instructions at

least 10% of the time (AR 526, 650). The third limitation is consistent with Dr. Rickard's conclusion that Mr. Wortman's "short and long-term memories appeared to be intact and he was able to concentrate and attend to tasks." (AR 506.)

The court concludes that the ALJ's RFC properly depends on medical opinion evidence in the record and is not the product of the ALJ's lay interpretation of raw medical data.

## III.   Vocational Expert

Mr. Wortman next argues that the ALJ erred by not asking VE Parker a hypothetical question that included all of the limitations specified in the RFC. (Doc. 15-1 at 12–13.) He points out that the ALJ did not ask any questions about whether Mr. Wortman could perform his past relevant work in light of the RFC's limitations regarding "brief superficial contact with the public, tasks involving four to five step instructions, maintaining concentration for two hour intervals, and adapting to routine workplace changes." (*Id.* at 13.) He contends that the incomplete questions posed by the ALJ are therefore insufficient to constitute substantial evidence that Mr. Wortman can perform his past relevant work. (*Id.* at 13.)

The court disagrees. Here, the ALJ questioned Mr. Wortman extensively about his past work. (AR 41–44, 62–66.) He also asked the VE specific questions about the mental demands of some of Mr. Wortman's past positions: security guard, warehouse worker, inventory clerk, stock clerk, and landscape laborer. (AR 77–80.) The ALJ asked whether Mr. Wortman had performed any of the jobs for long enough to become competent at them, whether the jobs required "interactions with larger groups," and whether they required "extensive reading." (AR 78–80.) The ALJ relied on this testimony in concluding that Mr. Wortman could perform some of his past relevant work. (AR 22.)

This is sufficient to support the ALJ's finding at step four. Mr. Wortman does not argue that he in fact *cannot* perform his past relevant work in light of the RFC assessed by the ALJ.

He argues that the incomplete hypotheticals render the finding that he can perform his past relevant work fundamentally unsupported by substantial evidence. At step four, the burden remains on the claimant to prove that he cannot perform his past relevant work. *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008).

While an ALJ *may* consider the testimony of a vocational expert at step four, he is not required to do so. *Cichocki v. Astrue*, 534 F. App'x 71 (2d Cir. 2013); *Petrie v. Astrue*, 412 F. App'x 401, 409 (2d Cir. 2011). The regulations specify that the ALJ *may* consider a wide variety of evidence at that step, including the testimony of a vocational expert, in determining whether a claimant can perform past relevant work:

> *Determining whether you can do your past relevant work.* We will *ask you for information about work you have done in the past.* We may also ask other people who know about your work. (See § 404.1565(b).) We *may use the services of vocational experts* or vocational specialists, *or other resources,* such as the "Dictionary of Occupational Titles". . . , to obtain evidence we need to help us determine whether you can do your past relevant work, given your residual functional capacity. *A vocational expert or specialist may offer relevant evidence* within his or her expertise or knowledge *concerning the physical and mental demands of a claimant's past relevant work,* either as the claimant actually performed it or as generally performed in the national economy. *Such evidence may be helpful in supplementing or evaluating the accuracy of the claimant's description of his past work.* In addition, a vocational expert or specialist *may offer expert opinion testimony in response to a hypothetical question* about whether a person with the physical and mental limitations imposed by the claimant's medical impairment(s) can meet the demands of the claimant's previous work, either as the claimant actually performed it or as generally performed in the national economy.

20 C.F.R. §§ 404.1560(b)(2), 416.960(b)(2) (emphasis added).[8]

---

[8] It is only at step five, when it is the Commissioner's responsibility to demonstrate that there are no jobs in the national economy that the claimant can perform, that an ALJ must rely either on the Medical Vocational Guidelines or the testimony of a vocational expert to determine "that significant numbers of jobs exist in the national economy that the claimant can perform." *McIntyre v. Colvin*, 758 F.3d 146, 151 (2d Cir. 2014); *see also* 20 C.F.R. §§ 404.1560(c)(2), 416.960(c)(2) (at step five, the Commissioner is "responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that you can do, given your residual functional capacity and vocational factors").

The ALJ's decision follows the regulations. He considered Mr. Wortman's testimony about his past work and obtained evidence from the VE "concerning the physical and mental demands of [Mr. Wortman's] past relevant work," as specified in the regulations. He then "compar[ed] the claimant's residual functional capacity with the physical and mental demands of each of the above-noted jobs." (AR 22.) He specifically concluded that Mr. Wortman could not perform his past work as inventory clerk, but could work as a security guard, warehouse worker, stock clerk, and landscape laborer. (*Id.*) The ALJ was not required by regulation to obtain answers to hypothetical questions that included every last nonexertional limitation in Mr. Wortman's RFC.[9]

---

[9] The court notes that, even at step five, a failure to include non-exertional limitations in hypotheticals posed to vocational experts frequently can be harmless error:

> We hold, however, that an ALJ's failure to incorporate non-exertional limitations in a hypothetical (that is otherwise supported by evidence in the record) is harmless error if (1) medical evidence demonstrates that a claimant can engage in simple, routine tasks or unskilled work despite limitations in concentration, persistence, and pace, and the challenged hypothetical is limited to include only unskilled work; or (2) the hypothetical otherwise implicitly accounted for a claimant's limitations in concentration, persistence, and pace.

*McIntyre*, 758 F.3d at 152 (quotation marks and alterations omitted).

## Conclusion

For the reasons stated above, Mr. Wortman's Motion to Reverse the Commissioner's Decision (Doc. 15) is DENIED, the Commissioner's Motion for Order Affirming the Commissioner's Decision (Doc. 18) is GRANTED, and the decision of the Commissioner is AFFIRMED.

Dated at Rutland, in the District of Vermont, this 5 day of September, 2017.

Geoffrey W. Crawford, Judge
United States District Court